UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON

CIVIL ACTION NO. 2:19-00149 (WOB-CJS)

JEFF WOLFF, as Ancillary
Administrator of the Estate
Of Jeffrey Brian Kidwell                          PLAINTIFF

VS.                   <u>MEMORANDUM OPINION AND ORDER</u>

MAYBACH INT'L GROUP, INC.,
ET AL.                                            DEFENDANTS

This matter is before the Court on pending motions for summary judgment (Docs. 145, 147). The Court previously heard oral argument from the parties and took the matter under submission.

Having given the matter further study, the Court now issues the following Memorandum Opinion and Order.

*Factual and Procedural Background*

On April 18, 2018, between 5:00 P.M. and 6:00 P.M., Jeffery Kidwell parked his truck in a parking spot of a Flying J truck stop in Walton, Kentucky. (Doc. 32 at ¶ 14). According to Kidwell, he went inside the rest stop to use the restroom, and then returned to his truck to begin his "post trip inspection." (Doc. 148-10, Kidwell Dep. at 10:22-11:16). When he returned to his truck, there was a Maybach truck parked in the space to the left of his truck. (*Id.* at 13:13-14:13). Both trucks were within their respective parking spaces, although photographs taken shortly after the

accident show that Kidwell's truck was only about a foot away from the line. (*Id.* at 45; Doc. 148-9, Farlow Dep. at 95:11–22).

Kidwell claims that he put on a reflective safety vest before beginning his inspection. (Doc. 148-10, Kidwell Dep. at 14:24–15:3). He testified that he looked under the hood of his truck, checked his tires and mirrors, then walked around the passenger's side of the truck. (*Id.* at 15:4–16:3). He checked the back of his truck before walking around to the driver's side of the trailer. (*Id.* at 16:6–10). He claimed that he was inspecting the middle of his trailer when he felt a sting in the back of his legs before he lost consciousness. (*Id.* at 16:15–25:22).

The driver of the Maybach truck, Nenard Madzarevic, wrote in an incident report that he started moving very slowly out of his parking space to turn left to exit the rest stop. (Doc. 144-6, Kidwell Dep. at 52). An accident reconstruction expert has opined that Madzarevic's misjudgment of the turn caused the right back end of his trailer to swing into Kidwell's tractor. (Doc. 148-9, Farlow Dep.; *see also* Doc. 148-11, Christian Dep. at 52:4–22). The damage is well-documented in various photographs and explained in expert reports. (Doc. 148-9, Farlow Dep. at 58:2–61:25).

When the Maybach trailer swung into Kidwell's parking space, Kidwell was pinned against his own tractor. (Doc. 148-10, Kidwell Dep. at 17:10). He was then dragged from that point and eventually dropped slightly in front of his tractor. (*Id.* at 17:16–23). He

suffered severe injuries including a dislocated left arm, fractured and broken ribs, and he had to have his spleen removed. (*Id.* at 26:10-15). He was airlifted to the University of Cincinnati where he was on a ventilator for two weeks. (*Id.* at 25:17-20, 26:18-27:2). Kidwell was eventually transferred back to his home state of Texas where he continued to endure grueling rehabilitation sessions. (*Id.* at 29:14-32:6). He was unable to work from the time of his accident until his death in September 2021.[1] (*Id.* at 33:17-21).

Sergeant Kenneth Christian of the Boone County Sheriff's Department responded to the accident. When he arrived on scene, he testified that Kidwell was not wearing a safety vest.[2] (Doc. 148-11, Christian Dep. at 20:1-2; *see also id.* at 71). He also interviewed other truck drivers, but no one he spoke with witnessed the accident. (*Id.* at 73). Christian also spoke with the driver, Madzarevic, who did not even realize he had hit Kidwell and had to be flagged down by another driver. (*Id.* at 55:10-57:9). Christian testified that Madzarevic had a difficult time communicating with

---

[1] Kidwell's death was caused by cancer, unrelated to this accident. (Doc. 148-10 at 6:3-16, 40:1-4).

[2] Christian's report of the incident indicated that Kidwell *was* wearing a safety vest, (s*ee* Doc. 148-11, Christian Dep. at 73), although a screen shot of Christian's body camera footage clearly shows that Kidwell was *not* wearing a safety vest. (*Id.* at 71). Christian could not account for this discrepancy. (*Id.* at 20:3-22:3).

him and answering basic questions about the incident. Christian cited Madzarevic for failure to communicate. (Doc. 148-11, Christian Dep. at 77).

At the time, MNJ and Maybach were parties to a Contractor Agreement (the "Agreement"). (Doc. 145-6). MNJ Trucking, Inc. owned the tractor Madzarevic was operating and leased it to Maybach, who provided the DOT carrier authority for the tractor. (*Id.* at 4). Maybach then allowed MNJ to operate the truck under its operating authority. (*Id.*).

The procedural background of this case is somewhat complicated. Kidwell originally filed suit in Cook County, Illinois. That Court dismissed the case under *forum non conveniens* and directed that it be filed in Boone County, Kentucky where the accident occurred. (*See generally* Doc. 1-1). Defendants then removed the case to this court based on diversity jurisdiction. (Doc. 1).

About six months after this case was removed, Schneider National Carriers, who employed Kidwell, filed a motion to intervene. (Doc. 37). Schneider sought to recover from the defendants Plaintiff's medical expenses and workers' compensation benefits. The Court granted the motion to intervene. (Doc. 55). However, in March of 2022, the parties stipulated to the voluntary dismissal of Schneider's claims. (Doc. 136).

Currently before the Court are Plaintiff's three claims against Defendants Maybach and MNJ: (1) negligence; (2) negligent hiring, retention, supervision, entrustment, and training; and (3) negligence per se. (Doc. 32).

### *Analysis*

### A. Negligence of Madzarevic

The Court must first determine whether the driver of the Maybach truck, Madzarevic, was negligent as a matter of law. In Kentucky, there are four elements to a negligence claim. A plaintiff must prove: (1) a duty owed by the defendant to the plaintiff; (2) breach of that duty; (3) injury to the plaintiff; and (4) legal causation between the defendant's breach and the plaintiff's injury. *Wright v. House of Imports, Inc.*, 381 S.W.3d 209, 213 (Ky. 2012).

"The duties required of a driver by KRS 189.330(7) and 189.330(4) or any other statutory provision regulating the operation of a motor vehicle do not apply where the motor vehicle is being operated on private property at the time of the accident." *Johnson v. Haddix*, 522 S.W.2d 859, 860 (Ct. App. Ky. 1975). Instead, the only duty required of drivers on private property is to exercise such care for his own safety and the safety of others as an ordinary careful and prudent person would exercise in the same or similar circumstances. *Id.* Because the accident here occurred on private property, Madzarevic owed Kidwell only this

5

general duty of care. (*See* Doc. 148-11, Christian Dep. at 25:21-26:11 (explaining that Madzarevic was not issued any moving traffic citations because the accident occurred on private property)).

Even so, a reasonable jury could conclude that Madzarevic breached his duty of care by, at a minimum, failing to account for the swing of the back end of his truck as he pulled out of his parking space. Although there were no eyewitnesses to the accident, photographic evidence, police testimony, and expert testimony show that Kidwell's front tractor was damaged, and Madzarevic's ICC bar of his trailer was similarly damaged. (Doc. 148-9, Farlow Dep. at 58:13-62:4); *see also* Doc. 148-11, Christian Dep. at 27:12-36:18; Doc. 144-6 at 80-86). A reasonable jury could find that Madzarevic misjudged his turn, and thus the back of his truck swung into Kidwell's parking space and hit his tractor. (Doc. 148-9, Farlow Dep.; *see also* Doc. 148-11, Christian Dep. at 52:4-22).

There is also sufficient evidence to support a finding of causation between the breach by Madzarevic and Kidwell's injuries. It is not enough for Kidwell to prove that Madzarevic's trailer merely crossed the line into his parking spot. *See Ferguson v. Undertow Trucking, Inc.*, 2011-CA-64, 2011 WL 6743337, at *5 (Ct. App. Ky. 2011). He must instead show that Madzarevic's negligent conduct was a substantial factor in bringing about the harm he suffered. *Id.* A substantial factor would have "such an effect in

6

producing the harm as to lead reasonable men to regard it as a cause . . . ." Restatement (Second) of Torts § 431 cmt. a (1965).

Causation is typically a mixed question of law and fact, *id.*, and the Court concludes that this issue is also for a jury.

### B. Comparative Negligence

The next question is whether there is evidence that Kidwell's own negligence contributed in some way to his injuries. *See Hilen v. Hays*, 673 S.W.2d 713, 714 (Ky. 1984). Ordinarily, the question of whether the accident was caused solely by the defendant's negligence, or was contributed to by plaintiff, is left for the jury to determine. *Eichstadt v. Underwood*, 337 S.W.2d 684, 686 (Ct. App. Ky. 1960).

"In actions in which a defendant-motorist seeks to prove that a plaintiff-pedestrian's own negligence contributed to the occurrence of the accident, the motorist must make a showing that the pedestrian was under some kind of duty to exercise care on his own behalf so as to avoid injury to himself." 128 Am. Jur. Proof of Facts 3d, § 5. "The basic duty governing the actions of a pedestrian is that a pedestrian is required to exercise ordinary care and safety for his or her own benefit." *Id.* at § 6.

A pedestrian's duty to exercise ordinary care and safety also extends to conduct or behavior that precedes the moment of injury but directly causes the injury in some way and may include factors such as visibility of clothing worn, intoxication, and other

7

factors. *See Johnson v. Morris' Adm'x*, 282 S.W.2d 835, 836–37 (Ky. Ct. App. 1955).

Also related to a pedestrian's basic duty of exercising ordinary care and safety is the requirement that he anticipate the presence and actions of motorists. 128 Am. Jur. Proof of Facts 3d, § 7. This duty of anticipation requires that the pedestrian use his senses, particularly sight and hearing, to determine that the position or actions of motorists present no danger to walking along or crossing a road. *Id.; see also Pryor's Adm'r v. Otter*, 105 S.W.2d 564, 566 (Ky. Ct. App. 1937) ("The pedestrian must exercise ordinary care for his own safety, which unquestionably includes the duty to observe the traffic conditions and take proper precautions to avoid placing himself in such a position that a motorist who is himself exercising due care may be unable to avoid injuring him.").

While a reasonable jury could conclude that Madzarevic misjudged the turn as he exited his parking space, and that this in turn caused Kidwell to be pinned to his truck, the Court cannot say that the evidence conclusively shows that Kidwell was not contributorily negligent. *See Eichstadt*, 337 S.W.2d at 686.

First, Kidwell's account of the events that day have been disproven or called into question by other evidence. Although not dispositive, there is a question as to whether he was wearing a safety vest as he claims. (Doc. 148-10, Kidwell Dep. at 14:24–

8

15:3). The responding police officer testified that when he arrived Kidwell was not wearing the vest. (Doc. 148-11, Christian Dep. at 20:1-2; *see also id.* at 71). Instead, he was wearing a black sweatshirt, which may have contributed to Madzarevic being unable to see him alongside his truck.

Second, there is some dispute over where Kidwell when he was struck. Kidwell has claimed that he was completing a "post trip" inspection and was struck "around the middle of his trailer." (Doc. 148-10, Kidwell Dep. at 14:24-16:15). However, Kidwell's own expert testified that this was "physically impossible." (Doc. 148-9, Farlow Dep. at 80:19-81:2; *see also* Doc. 158-4 at 9). The accident reconstruction experts also cannot pinpoint which direction Kidwell was facing when the truck struck him. Because he was parked so close to the line, if he was facing the front or back of his truck, there is a chance that his body was overhanging into Madzarevic's spot, which may have contributed to his inability to avoid being pinned. (Doc. 148-9, Farlow Dep. at 143:4-25).

Third, there is evidence from which a jury could reasonably conclude that Kidwell was negligently unaware of his surroundings. Kidwell testified in his deposition that he did not hear the motor of Madzarevic's truck as he completed his inspection, nor did he hear Madzarevic release his parking brake system, (Doc. 148-10, Kidwell Dep. at 98:13-99:1), which experts testified he should have heard.  (Doc. 148-9, Farlow Dep. at 135:21-25). His own

accident reconstruction expert testified that Madzarevic's truck would have been moving forward for roughly sixteen seconds, which would have given Kidwell some time to perceive that there was a moving truck close to him. (Doc. 148-9, Farlow Dep. at 106:3–7). Another expert's report states that audible signals such as "suspension flexing, tire noise, and air driers exhausting air" should have alerted Kidwell to potential danger. (Doc. 158-4 at 10).

Accordingly, there is evidence that Kidwell may have been contributorily negligent. A jury is entitled to hear the evidence and assign fault accordingly.

### C. Vicarious Liability

The Court must also determine whether Maybach may be held vicariously liable for Madzarevic's negligence.

The Contractor Agreement between Maybach and MNJ identifies Maybach as a motor carrier operating in interstate commerce pursuant to the authority issued by state and federal agencies, whereas MNJ is labeled as an "independent contractor." MNJ is the owner and operator of the truck. Maybach leases the truck from MNJ and provides it with carrier authority.

The Agreement then provides:

INDEPENDENT CONTRACTOR shall provide CARRIER transportation related services and lease to Carrier the equipment set forth below, which may be amended by mutual agreement. INDEPENDENT CONTRACTOR represents and warrants that INDEPENDENT CONTRACTOR has title to or is

10

otherwise authorized to contract the Equipment and services to CARRIER. By signing this agreement, CONTRACTOR agrees to operate under CARRIER authority <u>only</u> so as any driver employed by the CONTRACTOR."

(Doc. 145-6 at 4) (emphasis in original).

Additionally, the Agreement states as follows regarding the relationship amongst the parties:

It is expressly understood and agreed that INDEPENDENT CONTRACTOR (and each of its drivers) is an independent contractor for the Equipment and driver services provided pursuant to this Agreement, and that INDEPENDENT CONTRACTOR agrees to defend, indemnify, and hold CARRIER harmless for any claims, suits, or actions, including reasonable attorney's fees in protecting CARRIER's interests, brought by INDEPENDENT CONTRACTOR, its employees, any union, the public, or state or Federal agencies, arising out of the operation of the Equipment pursuant to this Agreement subject, but not limited to, the following conditions:

(a)     INDEPENDENT CONTRACTOR hereby assumes full control and responsibility for all hours scheduled and worked, wages, salaries, employment-related insurance, state and federal taxes, fringe benefits, and all other costs relating to the use of drivers provided by INDEPENDENT CONTRACTOR pursuant to this Agreement. INDEPENDENT CONTRACTOR assumes full responsibility for the selection, training, hiring and disciplining, verification of immigration status, setting of hours, setting of wages, setting of benefits and standards of conduct for each of its drivers and laborers.

. . . .

(b)     As required by law, CARRIER agrees to file information tax returns (Form 1099) representing payments to INDEPENDENT CONTRACTOR.

(*Id.* at 15) (emphasis in original).

11

The Agreement also states that the Independent
Contractor is responsible for its driver's compliance with
pertinent laws and regulations. (*Id.* at 6). The Independent
Contractor is responsible for operational expenses such as
oil, fuel, and tires. (*Id.* at 7). The Agreement also specifies
that the Carrier will maintain public liability insurance,
whereas the Independent Contractor was required to maintain
bobtail insurance. (*Id.* at 13–14).

The lease Agreement between MNJ and Maybach is governed by an
ICC[3] regulation that states:

> Except as provided in the exemptions set forth in Subpart
> C of this part, the written lease required under §
> 376.11(a) shall contain the following provisions. The
> required lease provisions shall be adhered to and
> performed by the authorized carrier.
>
> . . .
>
> (c)  Exclusive possession and responsibilities
>
> (1)  The lease shall provide that the authorized carrier
>     lessee shall have exclusive possession, control, and
>     use of the equipment for the duration of the lease.
>     The lease shall further provide that the authorized
>     carrier lessee shall assume complete responsibility
>     for the operation of the equipment for the duration
>     of the lease.

---

[3] "The ICC was abolished in 1995, and today, the Federal Motor
Carrier Safety Administration (FMCSA), formerly a part of the
Federal Highway Administration, within the United States
Department of Transportation, maintains the regulations and
promulgates new ones." *Bays v. Summitt Trucking, LLC*, 691 F. Supp.
2d 725, 728 n.1 (W.D. Ky. 2010) (citation omitted). Because case
law generally still refers to ICC regulations, the Court will also
use this term.

12

. . .

> (4) *Nothing in the provisions required by paragraph (c)(1) of this section is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee. An independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. § 14102 and attendant administrative requirements.*

39 CFR § 376.12 (2018) (emphasis added); (*see also* Doc. 145-6 at 13).

Next, because this is a diversity action governed by Kentucky substantive law, Kidwell must show that Kentucky law imposes liability on Maybach, or, that federal law preempts Kentucky law and imposes liability on Maybach. Kidwell primarily argues that federal law preempts Kentucky state law, so the Court addresses that issue first.

   *i.   Statutory Employee Issue*

Kidwell argues that under federal law, Madzarevic is a statutory employee of Maybach. The Department of Transportation regulations define an employee as "any individual . . . who is employed by an employer and who in the course of his or her employment directly affects commercial motor vehicle safety. Such term includes a driver of a commercial motor vehicle (including an independent contractor while in the course of operating a commercial motor vehicle) . . . ." 49 CFR § 390.5 (2017). Therefore, Kidwell argues that this regulation abolished the

independent contractor/employee distinction so long as the driver is in the course of operating a commercial vehicle.

The problem for Kidwell, however, is that even though Madzarevic was operating a commercial vehicle, Maybach contracted with MNJ, not with Madzarevic. MNJ, of course, is a separate entity licensed in the state of Florida. (Doc. 145-6).

Because Maybach contracted with MNJ to operate the truck, the Court must determine whether the CFR employment regulations intended to include legal persons such as MNJ as employees. "Although in ordinary usage both 'individual' and 'person' often refer to an individual human being, 'person' often has a broader meaning in the law." *Clinton v. City of New York*, 542 U.S. 417, 428 n.13 (1998); *but see id.* at 428 (ruling that "individual" can sometimes mean "person"). But here, the regulations use "individual" to define an employee, but "person" to define an employer.

Courts that have addressed this issue have found that the distinction is material and that regulators intended "individual" to only refer to human beings, not other legal entities. *See Crocker v. Morales-Santana*, 854 N.W.2d 663, 672 (N.D. 2014); *Brown v. Temain*, No. 2:09-cv-81, 2010 WL 5391578, at *5 n.3 (N.D. Ind. Dec. 22, 2010); *Brown v. Truck Connections Int'l, Inc.*, 526 F. Supp. 2d 920, 924-25 (E.D. Ark. 2007). Accordingly, Maybach is not

14

appropriately considered the statutory employer of Madzarevic under federal law.

### ii. Strict Liability

In the alternative, Kidwell argues that the Motor Carrier Act requires that motor carrier companies take full direction and control of their leased vehicles to prevent them from engaging in evasive independent contractor agreements. Therefore, Kidwell argues that motor carriers are strictly liable for the negligence of those driving under their carrier authority. Although this was once true, the regulations have changed and no longer impose such strict liability.

Kidwell argues that the Sixth Circuit embraced strict carrier liability in *Johnson v. S.O.S. Transport, Inc.*, 926 F.2d 516 (6th Cir. 1991). *Johnson* states, "Importantly . . . the operator's status, whether it be as an independent contractor or employee of a carrier, is irrelevant." *Id.* The panel in *Johnson* also noted: "Accordingly, this Court finds that the ICC regulations enacted pursuant to the Interstate Common Carrier Act create an irrebuttable presumption of an employment relationship between a driver of a leased vehicle furnished by a contractor-lessor and a carrier-lessee." *Id.* Kidwell thus argues that Maybach is liable as a matter of law for the negligence of Madzarevic.

However, the reasoning in *Johnson* is no longer good law. First, *Johnson* was decided before the 1992 amendments to the ICC

15

regulations. And second, most of the reasoning on which Kidwell relies is dicta which contradicts the reasoning in an earlier Sixth Circuit case, *Wilcox v. Transamerican Freight Lines, Inc.*, 371 F.2d 403 (6th Cir. 1967). Judge Coffman of the Western District of Kentucky conducted a well-reasoned analysis of *Johnson* and came to the same conclusion. *Bays v. Summitt Trucking, LLC*, 691 F. Supp. 2d 725, 729-30 (W.D. Ky. 2010). The Court hereby incorporates and adopts her reasoning by reference.

Plaintiff also cites to *Gilstorf v. Top Line Express, Inc.*, No. 96-3081, 1997 WL 14378, at *2 n.6 (6th Cir. Jan. 14, 1997), to argue that the Sixth Circuit has adopted a strict liability interpretation of ICC regulations. Kidwell points to a footnote in the case which states: "Most courts have concluded as a matter of federal law that the ICC regulations impose an irrebuttable statutory employment relationship between the driver and carrier-lessee . . . The Sixth Circuit has not yet done so however." *Id.* (citations omitted). Yet nowhere in this unpublished opinion does the Sixth Circuit actually state that it **does** adopt these regulations. "This court cannot take such an oblique discussion in a footnote as a statement of Sixth Circuit law." *Bays*, 691 F. Supp. at 730.

The Court also is not persuaded by other cases the plaintiff cites from the Western and Middle Districts of Tennessee. *See, e.g., Holliday v. Epperson,* No. 1:02-CV-1030-T, 2003 WL 2340746,

16

at *3 (W.D. Tenn. Aug. 26, 2003) (noting that 49 C.F.R. §
376.12 "imposes an irrebuttable statutory employment relationship
between the driver and the carrier-lessee"). Though the Court
respects these decisions, it agrees with Judge Coffman that their
reasoning fails to adequately account for the changes in the ICC
regulations. *See Bays*, 691 F. Supp. 2d at 730. In any event, these
cases are not binding on this Court.

The Court observes that Kidwell primarily cites cases from
the 1970s and 1980s, but he offers very little recent case law to
support his position.

In fact, the ICC has dissuaded courts from applying a strict
liability standard to carriers:

> We prefer that courts decide suits of this nature by
> applying the ordinary principles of State tort,
> contract, and agency law. The Commission did not intend
> that its leasing regulations would supersede otherwise
> applicable principles of State tort, contract, and
> agency law and create carrier liability where none would
> otherwise exist. Our regulations should have no bearing
> on this subject. Application of State law will produce
> the appropriate results.

3 I.C.C.2d 92, 93 (1986); *see also Ross v. Wall Street Sys.*, 400
F.3d 478, 480 (6th Cir. 2005) (explaining that the ICC regulations
have changed, and logo liability is no longer in effect). The ICC,
as an administrative agency, is entitled to deference when
interpreting its own regulations. *Bays*, 691 F. Supp. 2d at 730
(citing *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414
(1945)).

17

The amended regulations in 1992 also clarified this point. Section (c)(4) asserted the neutrality of section (c)(1) and explicitly stated that "the regulation does not affect 'employment' status." This petition was meant to "give notice to the courts . . . that [(c)(1)] . . . is not intended to affect the relationship between a motor carrier lessee and the independent owner-operator lessor." *Pet. to Amend Lease and Interchange of Vehicle Regulations,* 8 I.C.C.2d 669, 671 (1992).

This conclusion aligns with legislative history and public policy. In 1956, Congress amended the Interstate Common Carrier Act "'[i]n order to protect the public from the tortious conduct of the often judgment-proof truck-lessor operators . . . [by] . . . requir[ing] interstate motor carriers to assume full direction and control of the vehicles 'as if they were the owners of such vehicles.'" *Morris v. JTM Materials, Inc.,* 78 S.W.3d 28, 37-38 (Tex. App. 2002) (quoting *Price v. Westmoreland,* 727 F.2d 494, 495-96 (5th Cir. 1984)). However, as the *Bays* court noted, "holding carriers strictly liable does more than level the playing field when it comes to a carrier's vicarious liability for contract and employee drivers; it over-corrects the problem Congress sought to address." *Bays*, 691 F. Supp. 2d at 731.

Instead, courts in the Sixth Circuit have interpreted these regulations to create a rebuttable presumption of agency when driving under the FMCSA operating authority. *Bays*, 691 F. Supp. 2d

18

at 730; *Gonzalez v. Point Logistics, Inc.*, 2021 WL 3197039, at *3 (W.D. Ky. July, 28, 2021); *see also Edward v. McElliotts Trucking, LLC*, 268 F. Supp. 3d 867, 879 (S.D. W.Va. Aug. 2, 2017). The burden to rebut this presumption rests with Maybach. *Gonzalez*, 2021 WL 3197039, at *5.

*iii. Independent Contractor*

Having determined that federal law does not supersede state law agency principles, the Court next turns to whether Maybach has sufficiently rebutted the presumption that Madzarevic is its employee.

The Court first rejects Kidwell's argument that Maybach admitted in its Answer(s) that Madzarevic was an employee of Maybach. First, an answer is not considered an admission when it is superseded by an amended answer. *Kay v. Mincas Grp. (USA), Inc.*, 580 F. App'x 327, 331 (6th Cir. 2014). Second, the amended answer does not necessarily identify MNJ or Madzarevic as an employee of Maybach. Instead, it says merely that the accident occurred while Madzarevic was operating the Maybach truck "at the request and under the FMCSA operating authority of Maybach." (Doc. 155 at 6). This is not an admission as to Madzarevic's employment status.

The Court also briefly addresses Maybach's argument that MNJ admitted that Madzarevic was its employee. Though this may be true, cases have acknowledged that truck drivers may have more than one employer, subject to joint and several liability consistent with

19

state law. *Puga v. About Tyme Transport, Inc.*, 227 F. Supp. 3d 760, 765 (S.D. Tex. 2017). Accordingly, the fact that MNJ is an employer does not mean Maybach cannot also be an employer.

Turning next to the merits, Kentucky law considers nine factors in making this determination, which were discussed in *Ratliff v. Redmon*: (1) the extent of control that the alleged employer may exercise over the details of the work; (2) whether the worker is engaged in a distinct occupation or business; (3) whether that type of work is usually done in the locality under the supervision of an employer or by a specialist, without supervision; (4) the degree of skill the work requires; (5) whether the worker or the alleged employer supplies the instrumentalities, tools, and place of work; (6) the length of the employment; (7) the method of payment, whether by the time or the job; (8) whether the work is a part of the regular business of the alleged employer; and (9) the intent of the parties. 390 S.W.2d 320, 324-25 (Ky. 1965).

The Kentucky Supreme Court later explained that courts should focus primarily on four of these nine factors: (1) the nature of the work as related to the business generally carried on by the alleged employer; (2) the extent of control exercised by the alleged employer; (3) the professional skill of the alleged employee; and (4) the true intentions of the parties. *Chambers v. Wooten's IGA Foodliner*, 436 S.W.2d 265, 266 (Ky. 1969). *See also*

20

*Uninsured Employers' Fund v. Garland*, 805 S.W.2d 116, 119 (Ky. 1991).

Maybach points to its Agreement with MNJ in which the parties agreed that they would be in an independent-contractor relationship. Maybach also points to paperwork that Madzarevic completed before he drove, whereby he identified Nemanja Jerkovic (the owner of MNJ) as his employer. (Doc. 144-6 at 34). Finally, Maybach points out that MNJ and Madzarevic were free to decide which loads to accept or reject, which routes to take, and when to work under the terms of the Agreement. (*See* 145-6 at 15).

The Court is not persuaded that Madzarevic was an independent contractor as a matter of law. The Court must examine the substance of the relationship—not merely a document that labels it. *Husman Snack Foods Co. v. Dillon*, 591 S.W.2d 701, 703 (Ky. Ct. App. 1979).

Considering the above factors, the Court notes that the nature of the work between Maybach and Madzarevic are substantially similar. Maybach is a carrier that arranges for loads to be transported across the country. Madzarevic is simply a driver that completes these trips on behalf of Maybach. Thus, this factor does not weigh in favor of finding an independent contractor relationship.

Turning to the extent of control exercised by the alleged employer, the Court finds that the evidence does not tip the scales in favor of one type of relationship over another. Though it is

true that Madzarevic was free to accept or reject loads and choose the routes he was going to take, there were also other areas in which he had very little control. For example, he agreed to follow many of Maybach's policies and procedures, such as its unsafe driving policy, mobile device policy, and controlled substances and alcohol policy. (Doc. 144-6 at 36–39). Madzarevic also agreed that if he violated any of the policies, that he would be subject to discipline **by Maybach.** (*Id.* at 40). This is in direct conflict with the Agreement Maybach had with MNJ, under which MNJ was supposed to be fully responsible for its drivers. (Doc. 145-6 at 15) ("INDEPENDENT CONTRACTOR assumes full control and responsibility for the selection, training, hiring, **and disciplining** . . . of its drivers and laborers.") (emphasis added).

The next factor, professional skill, also does not weigh in favor of an independent contractor relationship. Courts have explained that truck driving requires "a significant amount of skill." *Zents v. Baylor Trucking Co.*, 2013 WL 1500678, at *8 (N.D. Ohio Apr. 11, 2013). But here, Maybach trained Madzarevic on this skill before he was permitted to drive under its carrier authority. This included watching training videos and passing a road test. (Doc. 144-6 at 18). Maybach's 30(b)(6) deposition witness testified that Madzarevic would have been at Maybach's headquarters in Illinois for several days to participate in this training. (Doc. 148-12, Haisan Dep. at 257:17–22). This also

22

conflicts with the Agreement, wherein MNJ was supposed to train its own drivers. (*See* Doc. 145-6 at 15).

The final factor, the true intent of the parties, also does not weigh in favor of Maybach. **Madzarevic applied to be a driver for Maybach, not MNJ.** (*Id.* at 134). There are many forms with Maybach letter head that instructed Madzarevic on Maybach's policies, yet only one document that acknowledges that he is driving for MNJ. (Doc. 144-6 at 34). The Court thus cannot conclude, as a matter of law, that Madzarevic intended to enter into an independent contractor relationship.

Some factors do weigh in favor of Maybach. For example, MNJ is a distinct legal entity, and MNJ was the company that paid Madzarevic for his work. Madzarevic also had not driven under Maybach's carrier authority for any significantly long period of time before this accident happened. Accordingly, Maybach has put forth some evidence to rebut the presumption of agency.

Therefore, the Court concludes that there is a triable issue as to whether Madzarevic was an employee or independent contractor of Maybach. *See Gonzalez*, 2021 WL 3197039, at *5 (deferring ruling on the independent contractor issue when faced with similar evidence instead of denying the motion outright).

> **D. Negligent Hiring, Retention, Training, and Supervision Claim**

Kidwell has also brought a claim against both defendants for negligent hiring, retention, supervision, training, and entrustment.

To prevail on such a claim, Kidwell must show that MNJ or Maybach knew, or reasonably should have known, that Madzarevic was unfit to be a commercial driver and this unfitness created an unreasonable risk of harm to others. *Grand Aerie Fraternal Order of Eagles v. Carneyhan*, 169 S.W.3d 840, 844 (Ky. 2005). Importantly, the plaintiff must also show that the hiring, supervision, or retention of the employee was the proximate cause of the injury. *Id.*

Madzarevic had a valid commercial driver's license and medical certification. There is no evidence there was anything in his driving history that should have alerted Maybach or MNJ to any potential issues with his driving. He passed his road test, and otherwise completed all the other required trainings. *See Espinal v. Wright*, No. 3:09-cv-861, 2012 WL 864783, at *3 (W.D. Ky. Mar. 13, 2012) (holding that when a driver had a valid CDL, passed a road test, and satisfactorily completed other training programs, there was no evidence of negligent hiring or training).

The only evidence Kidwell proffers on this issue is that Madzarevic's English skills were so lacking that he could not answer basic questions from Sergeant Christian about the accident. This is in violation of federal regulations, and Madzarevic was

24

cited for it. However, Madzarevic completed all his forms and commercial license tests in English, so Maybach and/or MNJ reasonably believed his English skills were sufficient to operate a truck.

Furthermore, there is also no evidence that Madzarevic's language skills were the proximate cause of Kidwell's injuries. This is not a case of a driver misreading a sign and going the wrong way down a street. This is a case about a driver misjudging a turn. The rules of physics are universal—it does not matter what language the driver speaks. Accordingly, this claim will be dismissed.

### E. Negligence Per Se Claim

Plaintiff has abandoned his negligence per se claim by failing to respond to Defendant's motion for summary judgment on it. *See Hicks v. Concorde Career Coll.*, 449 F. App'x. 484, 487 (6th Cir. 2011).


Therefore, having reviewed this matter, and being otherwise advised,

**IT IS ORDERED** that:

(1)   Maybach's motion for summary judgment (Doc. 145) be, and is hereby, **GRANTED IN PART AND DENIED IN PART**, consistent with this opinion;

(2)  Kidwell's motion for summary judgment (Doc. 147) be, and is hereby, **DENIED;**

(3)  This matter is **SET FOR A JURY TRIAL ON MONDAY, NOVEMBER 7, 2022 AT 10:00 A.M.** Each party shall have five (5) hours to present their case;

(4)  A final pretrial conference is **SET FOR FRIDAY, OCTOBER 14, 2022 AT 1:00 P.M.;** and

(5)  A copy of the Court's final pretrial order shall enter concurrently herewith.


This 12th day of September 2022.



Signed By:

***William O. Bertelsman***  *WOB*

**United States District Judge**